UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

JOHN DOE,

                    Plaintiff,

        v.                                      **COMPLAINT**

STATE UNIVERSITY OF NEW YORK PURCHASE
COLLEGE,

                    Defendant.

------------------------------------------------------------------X

       Plaintiff John Doe[1] ("Doe") by his attorneys, Aidala, Bertuna & Kamins, PC, and for his

Complaint against Defendant, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.   This action arises out of the damaging actions taken, inadequate procedures employed,

     and biased and erroneous applications of the relevant rules by Defendant, State

     University of New York Purchase College, ("SUNY Purchase") in the course and as a

     result of its gender-biased investigation and erroneous adjudication of a complaint of

     sexual misconduct filed by Jane Roe[2] ("Roe") against John Doe with the faculty and/or

     administration of SUNY Purchase; adjudicated by a Title IX administrative hearing

     comprised of the faculty and/or administration of SUNY Purchase; and erroneously

     affirmed by a Title IX appeal board comprised of the faculty and/or administration of

     SUNY Purchase,  as well as the failure of Defendant to protect Plaintiff from harassment

     and upon his return to SUNY Purchase after the adjudication in the fall of 2018.

---

[1] Plaintiff has filed herewith a motion to proceed pseudonymously as "John Doe," as he did in his Article 78 Petition.
[2] Roe is referred to herein pseudonymously.

2.  By written decision dated March 31, 2021 and filed on April 16, 2021, with Notice of Entry filed on April 21, 2021, the Appellate Division, Second Department, unanimously ruled that the determination that Doe engaged in sexual misconduct was **not** supported by substantial evidence and therefore granted Doe's Article 78 Petition, vacated the penalties imposed by that violation, dismissed the determination that Doe engaged in such conduct and directed Purchase to expunge all references to that finding from Doe's academic record. *In the Matter of the Application of John Doe v. Purchase College State University of New York*, Index No. 51492/2018, Doc. 27.

3.  However, the Court did not address Doe's claims that Defendant failed to substantially comply with notice procedures set for in the student Code of Conduct or for damages arising from SUNY Purchase's disciplinary decision which violated NY State law and federal law under Title IX, as well as its own policies on consent.

4.  Neither did the Court address Defendant's claim for "restitution and/or damages for all losses and or damages sustained as a result of [Defendant's] unlawful actions."

5.  Upon Doe's return to SUNY Purchase in the fall of 2018, Doe was subjected to a hostile environment replete with harassment and abuse from fellow students and deliberate indifference and retaliation from Defendant.

6.  Accordingly, Doe's brings this action for damages arising from the erroneous adjudication, violations of Doe's rights under state and federal law, breach of contract, hostile environment, damage to reputation, pain and suffering, attorney's fees and punitive damages.

7.  After engaging in consensual sex with John Doe on the night of April 19, 2017, in Doe's bed, Jane Roe, a student and "friend" of Doe, filed a complaint with Defendant that Doe sexually assaulted her.

8.  At the time of the incident that gave rise to the complaint of sexual misconduct, Doe was completing his freshman year at SUNY Purchase.

9.  Doe lived on campus in a dormitory suite "C216", which he shared with seven other students, in the Crossroads Residence Hall on the campus of SUNY Purchase.

10. On Wednesday, April 19, 2017, a group of Purchase College students, including Doe and Roe, gathered in Doe's suite following the rehearsal of an upcoming student theatrical production to celebrate a fellow student's birthday and to watch a movie.

11. During the party, the collection of approximately five (5) students shared a single 1.5 liter bottle of red wine.  Both Doe and Roe consumed some of the red wine.

12. Roe was affectionate with Doe throughout the evening, sitting in close proximity to him and cuddling with him.

13. After the movie concluded, Doe and some other friends left Doe's dormitory suite to attend another party.  Roe, however, stayed in Doe's suite with one of Doe's suitemates.

14. Approximately three (3) hours later, Doe returned to his suite and observed Roe and his suitemate sitting in a beanbag chair in the common area of the suite as he walked past them to his bedroom.

15. Roe asked Doe's suitemate to "go get [Doe]" and when the suitemate returned to the common area with Doe, Roe expressly asked Doe's suitemate to leave and give her some privacy with Doe.

16. Doe sat on the bean bag chair with Roe and they cuddled..

3

17. Roe asked to spend the night with Doe and she and Doe walked into Doe's bedroom together.

18. At that time, Doe's roommate was in Doe's room, sleeping in his own bed.

19. Roe changed into a pair of Doe's pajamas and then got into Doe's bed.

20. Doe and Roe laid in Doe's bed and began mutually kissing each other, which naturally progressed to heavy petting.

21. Roe assisted Doe in removing the pajama pants she was wearing that were Doe's.

22. Before engaging in sexual intercourse, Roe asked Doe to get a condom and Doe did so.

23. After retrieving the condom that Roe had asked Doe to use, the two began having sexual intercourse.   While engaging in sexual intercourse with Doe, Roe asked Doe to "go slower."

24. After sexual intercourse was over, Doe left his room briefly to smoke a cigarette.   When he returned, Roe stayed in Doe's bed and they mutually kissed.

25. At approximately 1:30 a.m., Roe borrowed a t-shirt from Doe to go to the bathroom, left Doe's dormitory room, and never returned.

26. Doe texted Roe, but received no response.

27. The following day Doe and Roe saw one another at a theater rehearsal and Roe behaved awkwardly.

28. The following afternoon, Roe sent Doe a text message which asked "[i]s it cool if I grab my stuff from your room [right now]."

29. Over the next few days, Doe was ostracized by his classmates, but did not know why.

30. Days later, based on the consensual sex engaged in by Doe and Roe on April 19, 2017, Jane Roe filed a complaint alleging that Doe sexually assaulted her.

31. A Title IX administrative hearing was held on July 27, 2017.

32. In a Title IX administrative hearing finding letter dated July 31, 2017, the hearing board

found, among other things, that:

> Both [Doe] and [Roe] reported in the hearing that there was a
> platonic relationship or friendship between them prior to
> Wednesday, April 19, 2017.  Both [Doe] and [Roe] reported in the
> hearing that the [Roe] was visibly upset prior to entering [Doe's
> bedroom], that [Roe] ***specifically requested to be comforted by
> [Doe], and that [Roe] requested to stay in [Doe's suite]*** on the
> early morning of Thursday, April 20, 2017.  Both [Doe] and [Roe]
> reported in the hearing to voluntarily lying in [Doe's] bed and
> cuddling with one another.  Both [Doe] and the [Roe] reported in
> the hearing to having kissed one another, though the extent of this
> kissing, and passion involved was in dispute.  Both [Doe] and the
> [Roe] reported in the hearing that ***the [Roe] requested that [Doe]
> retrieve a condom***.

33. Roe originally alleged that Doe sexually assaulted her because she was unable to consent

due to an anxiety attack.  However, during the course of the investigation, Roe changed

her story and claimed that she was unable to give consent due to alcohol and prescription

drug use.  The hearing board ultimately rejected Roe's allegation that she was unable to

consent due to any alleged impairment because ***"[Roe's] statements [were] conflicting

and unreliable as it pertained to her inability to give consent."***  Despite the foregoing,

the hearing board nevertheless held that Doe did not obtain consent to engage in some

sexual activity and therefore was in violation of Purchase College Student Code of

Conduct C.8.

34. Effectively, Doe was adjudicated a rapist.  On information and belief, as a result of Roe's

dissemination of her false accusations, Doe's compliance with restrictions immediately

imposed by Defendant and, later, the imprimatur of a "conviction" for what is a serious

crime, Doe was shunned by his classmates.

35. Upon finding Doe responsible for sexual misconduct, Defendant imposed the following sanctions: (1) suspension and "Persona Non Grata" status through August 1, 2018; (2) residence suspension with "Residence Area Persona Non Grata" status for one academic semester upon Petitioner's return to Purchase College; (3) disciplinary probation for one calendar year upon Petitioner's return to Purchase College; and (4) a wellness/substance education class to be completed prior to Petitioner's return to Purchase College (the "Sanctions").

36. SUNY Purchase's decision and sanction was arbitrary and capricious because the school applied an erroneous standard of "affirmative consent," and the determination reached was, itself, arbitrary and capricious and not supported by substantial evidence in the record.

37. On August 3, 2017, Doe appealed this erroneous decision, as he was entitled to do. Doe submitted his appeal to SUNY Purchase Campus Appeals Board. Specifically, Doe appealed the finding that he violated code C.8 of the Purchase College Student Code of Conduct. Petitioner based his appeal on the fact that the finding of the hearing board was "prejudicial, arbitrary, capricious, and not supported by substantial evidence." Doe argued that the school had applied an erroneous standard of "affirmative consent" in that the hearing board erroneously relied on a lack of *verbal consent*," notwithstanding that Roe verbally requested prior to intercourse that Doe retrieve a condom, thereby communicating to Doe her intent to engage in sexual intercourse with Doe.

38. Doe also appealed the Sanctions. Specifically, Doe noted that "the sanction imposed is disproportionate to the nature and circumstances of the offense of his actions. Not only is

the length of the suspension drastic, but the residence restriction upon return is unduly harsh for a student who is unable to commute to the Purchase College campus."

39. On August 14, 2017, the Appeal Board issued its decision, dated August 10, 2017, denying Doe's appeal.

40. Doe was barred from returning to SUNY Purchase for the academic year Fall 2017 and Spring 2018.

41. On November 2, 2017, Doe filed a Verified Petition for a judgment pursuant to Article 78, (1) declaring the disciplinary determinations and sanctions/penalties/actions made by SUNY Purchase as against him invalid on due process grounds for being arbitrary and capricious and as not supported by substantial evidence after a hearing; (2) declaring the disciplinary procedures, determinations, and sanctions/penalties/actions made by SUNY Purchase College, against Doe invalid for failure to follow the rules, procedures, and/or codes established and adopted by SUNY Purchase College; (3) granting affirmative relief reinstating Doe in good standing at Purchase College and expunging any and all references of/to the disciplinary incident at issue from my academic record; and (4) awarding Doe restitution and/or damages for all losses and/or damages sustained as a result of SUNY's unlawful actions (In the Matter of the Application of John Doe v. Purchase College State University of New York, Albany Supreme Court, NYSCEF Index No. 907202-17).

42. Respondent SUNY Purchase College obtained three extensions of time to file its Answer to the Article 78 Petition. By stipulation dated January 6, 2018, SUNY Purchase waived all jurisdictional, statute of limitations or *res judicata* grounds defenses. (NYSCEF Index No. 907202-17, Doc 12)

43. On February 2, 2018, this case was transferred from Albany County, Index No. 907202/2017 to Westchester County, Index No. 51492/2018.

44. On March 20, 2018, the Court on its own motion, transferred the proceeding pursuant to CPLR 7804 (g) to the Supreme Court, Appellate Division, Second Department. Index No. 51492/2018.

45. Whilst his Petition was still pending and having lost an entire academic year to this erroneous adjudication, on or about September 2018, Doe returned to SUNY Purchase as a sophomore.

46. Pursuant to the Residence Suspension sanction, Doe was forced to live alone and isolated in an off-campus rooming house miles from campus from which he took a bus to and from campus to attend class.

47. In addition, pursuant to his Residence Area Persona Non Grata status, Doe was banned from "residence areas" which included "interiors and surrounding areas" of Residence Halls, Dining Halls, residence area parking lots and off-campus apartments. Thus, Doe was effectively banned from any form of socialization with other students outside the classroom.

48. Pursuant to Disciplinary Probation, Doe was not eligible to hold office in any student group or organization; not eligible for "certain" unspecified employment positions on campus, and not eligible to participate in study-abroad programs. Further the Disciplinary Probation included the possibility of other, unspecified "conditions and obligations" and other unspecified limitations in "participation in other college activities and programs as determined by individual college units."

49. Thus, while nominally permitted to return as a student, Doe was prevented from meaningfully participating in the educational and residential life of the campus, reduced to making fleeting appearances for scheduled classes.

50. On information and belief, despite being informed by Doe's father of Doe's ostracism by his fellow students in his freshman class and specifically asked to take steps to ensure that Doe's new classmates not subject him to the same treatment, Defendant did nothing to protect Doe from harassment and abuse upon his return to SUNY Purchase in the fall of 2018.

51. Upon his return to campus, Doe was ostracized by his new classmates both in and outside the classroom as a result of Defendant's wrongful administrative determination, which was widely known; Defendant's draconian imposition of sanctions; and Defendant's failure and refusal to protect Doe from hostile and discriminatory treatment.

52. In the classroom, Doe was subjected to bullying. His SUNY Purchase classmates refused to speak to him. On one occasion that took place in the classroom, a female classmate refused to work with him due to the school's slanderous adjudication.

53. On another occasion, a Purchase student posted a picture of Doe on social media labeling him a "rapist." Doe made a formal complaint with Defendant concerning the social media post, but was never informed by Defendant that any consequences followed.

54. Doe informed Defendant of his ostracism and mistreatment, but Defendant did nothing to ameliorate the hostile educational environment within which Doe was expected to learn and function. In fact, SUNY Purchase defended the students' rights to mistreat Doe as an exercise of the students' rights to free speech.

55. Doe was subjected to hostile environment harassment by both defendant and the students at SUNY Purchase, and deliberate indifference and retaliation by defendant.

56. Distraught and unable to endure the isolation, harassment, and shunning, that he experienced both inside and outside the classroom, and because the Defendant chose not to protect Doe or to do anything to ameliorate the hostile environment harassment to which Doe was daily subjected, Doe withdrew from SUNY Purchase on October 8, 2018.

57. SUNY Purchase charged Doe for the full semester and refused to waive said fees due to the sexual assault adjudication that has now been held to have been erroneous.

58. Defendant's treatment of Doe upon his return to SUNY Purchase in the fall of 2018 was a result of gender bias.

59. On information and belief, Doe has been unable to obtain admission to a similar program at another university due to Defendant's erroneous sexual assault adjudication. The actions of SUNY Purchase effectively shattered Doe's dream of pursuing his chosen course of study, derailed his pursuit of a career in his chosen field, destroyed his personal and professional reputation, and caused him pain and suffering the magnitude of which will be proved at trial.

60. Three years and five months *after* Doe filed his Article 78 Petition, by written decision dated March 31, 2021, filed on April 16, 2021, the Appellate Division, Second Department, unanimously ruled that the determination that Doe violated Code C.8 was **not** supported by substantial evidence and therefore granted the Article 78 Petition, vacated the penalties imposed by that violation, dismissed the charge that Doe violated C.8 and directed Purchase to expunge all references to that finding from Doe's academic record. *In the Matter of the Application of John Doe v. Purchase College State University*

*of New York*, Index No. 514921/2018, Doc. 27.    Notice of Entry was filed on April 21,
2021.

61. However, the Court did not address Doe's claim for damages arising from SUNY
Purchase's disciplinary decision which violated NY State law and federal law under Title
IX, as well as its own policies on consent, which constituted due process and equal
protection violations and a breach of its contractual obligations.   Accordingly, Doe's
claim is for damages arising from the erroneous adjudication in violation of New York
State and federal law, Doe's further mistreatment by Defendant upon his return to SUNY
Purchase in the fall of 2018, also in violation of NY State law and federal law under Title
IX, breach of contract, damage to reputation, pain and suffering, attorney's fees and
punitive damages. Attached hereto as Exhibit A is the Notice of Intention to File a Claim
which was mailed by certified mail to the New York Attorney General (received June 7,
2021) and SUNY Purchase (received June 4, 2021).

62. Throughout the investigation and adjudication of Roe's complaint,  Defendant engaged in
substantial errors in violation of Federal law, State law and SUNY Purchase's own
policies. A non-exhaustive list of Defendant's wrongful actions includes the following:
(i) the finding of the hearing board was prejudicial, arbitrary, capricious, and not
supported by substantial evidence; (ii) Defendant applied an erroneous standard of
affirmative consent on Defendant and not on Roe; (iii) Defendant evidenced a gender
bias against Doe as the male accused of sexual misconduct; (iv) Defendant, with no
ascertainable evidentiary basis, gave more weight to Roe's assertions of non-consensual
sexual contact initiated against her by Doe than the weight they accorded Doe's assertion
that Roe, in fact, consensually and mutually engaged in sexual contact with him; (v)

Defendant made assessments of credibility and evidentiary weight with respect to each party and witness that were inconsistent with their determinations; and (vi) Defendant failed to afford Doe the requisite presumption of innocence required even by a preponderance of the evidence standard. Accordingly, Doe brings this action to obtain relief based on causes of action for violation of Title IX of the Education Amendments of 1972; violation of New York State Constitution's Equal Protection and Due Process, breach of contract, and promissory estoppel.

63. Upon Doe's return to SUNY Purchase in the fall of 2018, SUNY Purchase violated Title IX in that Doe was subjected to hostile environment harassment on the basis of gender bias which deprived him of his education and Defendant responded to Doe's complaints with deliberate indifference and retaliation. Defendant was aware of and facilitated the hostile environment harassment by evincing deliberate indifference and retaliation in the face of Defendant's plight.

## THE PARTIES

64. Doe is a natural person and a current resident of the State of New York. At all times relevant herein, John Doe was a student in good standing residing on Defendant SUNY Purchase's campus; a suspended student residing in New York; a suspended student residing off-campus due to a residence suspension with Residence Area Persona Non Grata status; or a person residing in New York.

65. Defendant SUNY Purchase, located in Purchase, New York, is a public college and is one of 13 colleges in the State University of New York system.

## JURISDICTION AND VENUE

66. This Court had jurisdiction over federal law claims and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because: (i) the federal law claims arise under the Constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims that form the same case or controversy under Article III of the United States Constitution.

67. This Court has personal jurisdiction over Defendant SUNY Purchase on the ground that it is conducting business within the State of New York and the Southern District of New York.

<strong>Factual Allegations Common to All Causes of Action</strong>

68. Doe grew up in Queens, New York and lived there with his family until he moved to Purchase, New York in the fall of 2016, to study at SUNY Purchase.

69. Doe, then 18, was accepted into the prestigious professional actor training program, the Conservatory of Theatre Arts in the School of the Arts at Purchase College, involving a four-year sequential course of study and a Bachelor's of Fine Arts Degree, at SUNY Purchase. This acting BFA program is one of only five in the nation that meets the standards of the Consortium of Conservatory Theatre Training Programs, and accepts only about twenty students a year.

70. As a freshman at SUNY Purchase, Doe was passionate about the program in which he was enrolled, and was thriving both socially and academically until the events described herein.

71. On Sunday, April 23, 2017, Roe went to the Purchase College University Police and reported that she has been sexually assaulted by Doe on the night of April 19.

72. Roe reported to the University Police that she and Doe reciprocally kissed and that Roe put on Doe's pajama bottoms.

73. Roe also confirmed to the University Police that she helped Doe remove Doe's pajama bottoms at the time she was wearing them.

74. Roe alleged to the University Police that she was unable to consent to any sexual acts with Doe solely because on the evening in question she was having an anxiety attack. She did not claim, however, that her inability to give consent was impaired due to consumption of alcohol or drugs.

75. Roe also reported to University Police that she was not afraid of Doe and did not want to press charges against Doe, but that she did not want to have to see Doe again.

76. Upon information and belief, on April 23, 2017, Roe's report of sexual assault was referred to Purchase College's Title IX Coordinator/Title IX Investigator, Ricardo Espinales.

77. On April 25, 2017, Doe, unaware of Roe's report of sexual assault, was verbally informed of a "No Contact Order" from Respondent's Director of Community Standards Melissa Glazer. However, Doe was not advised why the No Contact Order was issued, nor was he advised at that time that Roe reported a sexual assault.

78. On April 26, 2017, Glazer verbally informed Doe that she had received a report of sexual assault. However, Glazer stressed at that time that she "was unaware of the details" of the reported sexual assault. She informed Doe that the matter was being considered under Title IX and that it was Doe's responsibility to remove himself from locations where Roe was present. Glazer informed Doe that the University's Title IX coordinator would be "reaching out" to Doe sometime on or about May 1 or May 2, 2017.

79. Espinales investigated Roe's allegations between May 2, 2017 and June 1, 2017.

80. Espinales questioned Roe on May 2, 2017. Espinales began the interview by informing Roe about the school's amnesty policy, preventing a student reporting a sexual assault from getting in trouble for violating the school's alcohol consumption policy.

81. During the interview, Roe stated, for the first time, that she consumed "about 4 mugs of wine." Nevertheless, she also continued to claim that she was unable to give consent to any sexual activity due to her anxiety attack.

82. During the interview, and in an email sent to Espinales on May 23, 2017, Roe admitted that Doe would not know what her behavior was like during an anxiety/panic attack, and therefore was in no position to recognize it as such. She confirmed this during a subsequent hearing.

83. During the May 2, 2017 interview, and in her report to University Police, Roe omitted the fact that she asked Doe to use a condom. In a May 15, 2017 interview with Espinales, Roe stated that she could not remember if Doe used a condom. However, during the hearing, Roe admitted to asking Doe to retrieve and use a condom prior to sexual intercourse.

84. Espinales questioned Doe for the first time on May 9, 2017. Prior to Doe's meeting with Espinales, Doe had **not** received a "Disciplinary Specification of Charges" letter as required by Respondent's Student Code of Conduct.

85. It was only during Espinales' May 9, 2017 interview with Doe that Doe was finally allowed to view Roe's report and learn about the substance of the alleged sexual assault allegations.

86. During the interview, Espinales focused on whether Doe obtained "verbal consent," despite the fact that SUNY Purchase's definition of affirmative consent does not require verbal consent.

87. Along with Roe and Doe, Espinales interviewed three additional "witnesses." None of the witnesses reported seeing Roe in an intoxicated or otherwise incapacitated state. Moreover, none of the witnesses were in Doe's room or suite when Roe and Doe engaged in sexual relations.

88. Illogically, Espinales did not interview Doe's roommate, who was in the room with Doe and Roe when they engaged in sex.

89. Moreover, upon information and belief, SUNY Purchase never interviewed or took a statements from witnesses Roe claimed to have told about the incident, despite their identification by name in Roe's University Police report.

### SUNY Purchase Charges Doe

90. On June 28, 2017, SUNY Purchase decided to charge Doe with violating three (3) separate codes contained in the Purchase College Student Code of Conduct, namely:

C.8- Engaged or attempts to engage in any sexual act toward any individual without consent, including but not limited to: fondling; exposing oneself; anal, oral and/or vaginal penetration; or sexual intercourse with someone who is physically helpless (e.g. drunk and/or under the influence of a substance or substances rendering them helpless), unconscious, or otherwise incapacitated or unable to accurately communicate.

E.9A- Underage consumption of Alcohol

E.9D- College Alcohol Policy- All students must comply with the College Alcohol Policy:

Students of legal drinking age are permitted to consume alcohol in their rooms, suites, or apartments with the door closed.

· No alcohol is permitted in rooms, suites, or apartments where all assigned students are under 21 years old.

· If a room is shared by students who are under age and of legal drinking age, it must be clear that the alcohol is being consumed by those who are 21 years of age or older.

· Alcohol or empty alcohol containers are not permitted in freshman or wellness residence assignments, even if one or more residents are of legal drinking age.

· No person shall sell, deliver, give away, or cause, permit, or procure the sale, delivery, or giving away of alcoholic beverages to any person that is under the age of 21 years old.

· No person under the age of 21 may possess any alcoholic beverage (Please see Alcohol Beverage Policy).

91. SUNY Purchase's Charging Notice was not received by Doe until, July 10, 2017, which was two (2) months after Doe's interview with Espinales.

92. SUNY Purchase's charging letter does not detail the factual allegations in support of the charges. Additionally, SUNY Purchase's charging notice fails to put Petitioner on notice that he would be subject to sanctions after any suspension from the school had been served.

93. Doe admitted and accepted responsibility for code violations pertaining to SUNY Purchase's alcohol consumption policy.

94. Notably, no other student was charged with alcohol violations, despite four (4) other students admitting at the hearing that they shared the one (1) bottle of wine on the night of the alleged incident.

95. Doe vehemently denied, and denies to this day, any violation of code C.8.

96. At all times during the sexual contact mutually engaged in by Doe and Roe in Doe's bed on the night of April 19, 2017, Roe communicated consent by her words and actions.

Roe's spoken words (requesting that Doe retrieve a condom prior to vaginal penetration, requesting that Doe "go slower" while engaged in intercourse, and never saying "no," "stop" or any other negative statement indicating a withdrawal of consent) and her behavior as an active and willing participant in the sexual activity (cuddling and kissing Doe in his bed, taking off her pants, engaging in sexual intercourse, kissing Doe in his bed after sex and displaying absolutely no physical resistance whatsoever) never left any doubt in Doe's mind that Roe consented to the sexual activity in which they mutually engaged on the night of April 19, 2017, and Doe denies that any of the sexual activity engaged in by both he and Roe was without Roe's consent.

### The Hearing Board and Decision

97. On July 27, 2017, a three-member Administrative Hearing Board was convened to determine if Doe violated Defendant's Code of Conduct.

98. Roe began her testimony by referencing a "victim's bill of rights" for the proposition that she was not required to "reiterate the story" and would not be testifying to "every nitty gritty detail." She then read one of the affirmative consent definitions from the Code of Conduct and a definition of consent from the New York Penal Law.

99. Roe testified at the hearing that prior to the night in question, she considered Doe one of her "best friends," and that she and Doe "had been very intimate in a non-romantic way." Roe testified that she had asked to spend the night with Doe because "he was a comfort to get through the night."

100. Roe's testimony before the hearing board was wildly inconsistent, and resulted in the hearing board finding her testimony *"unreliable"* on the issue of consent.

18

101. Despite representations to both University Police and the Title IX investigator that she was incapable of giving consent due to an anxiety attack, Roe claimed at the hearing that she was incapable of consenting to sexual activity due to the consumption of alcohol, Adderral, and the anti-depressant Lexapro.

102. Roe testified only to have had two "coffee mugs" of wine several hours before she had sex with Doe and described herself as "a drinker."

103. Roe testified that she did not assist Doe in removing his pajama pants (which she was wearing), but then admitted that she had told University Police that she had, in fact, done so.

104. Roe testified that Doe was familiar with her anxiety attacks, but then admitted that Doe had never witnessed her have an anxiety or panic attack.

105. Roe testified that she neither did nor said anything that would communicate to Doe that she wanted to stop sexual activity and, in fact, admitted that she asked Doe to retrieve a condom prior to intercourse.

106. Roe testified that she was "fearful," despite having told University Police that she was not at all fearful of Doe. When asked by the hearing board to reconcile her statement that she was both fearful of Doe and that she trusted Doe, Roe responded that her fear derived from a prior sexual experiences with other men, and confirmed that Doe had never been violent with her.

107. Roe testified that she did not actually recall taking Adderall on the evening of April 19, 2017, and was relying on other witnesses' statements. This prompted the hearing board to question whether Roe's statements and testimony has been "tainted" by the statements of other witnesses.

108. By the time of the hearing, Roe was attributing her professed inability to consent to the effects of Lexapro and Adderall, notwithstanding the lack of any medical support for the assertion that the interaction of the two cause any such diminution of capacity.

109. Asked about her demonstrated presence of mind and capacity to ask Doe to use a condom, Roe conceded that she "verbally somewhat initiated" sexual activity.

110. None of the witnesses who testified or provided statements, testified that Roe was noticeably drunk or intoxicated. One witness, a prior sexual partner of Roe, claimed that he knew Roe was intoxicated because he saw an empty bottle next to Roe but that testimony was determined to be unreliable by the hearing board because the witness's testimony concerning what was consumed differed so greatly from the testimony of the other witnesses. That witness also contradicted his own earlier testimony that he did not notice any drunk or intoxicated individuals that night.

111. Two witnesses stated that Roe was "talkative" and "seemed to be in a happy mood" during the party in Doe's suite.

112. Another witness testified at the hearing via telephone that he and Roe spent one to two hours alone in Doe's suite after Doe had left with others to attend another party and that during that time period, Roe did not appear intoxicated; consumed no alcohol or drugs; and was "talkative" and "conversational" and "able to communicate cohesively."

113. The hearing board focused on "verbal consent," addressing at least four separate questions to Roe and Doe concerning verbal consent.

114. On July 31, 2017, the hearing board issued its decision. With respect to Roe's credibility, the hearing board found Roe's testimony "conflicting and unreliable as it pertained to her

inability to consent…and her statements on her alcohol and drug consumption were not consistent with her original report to University Police or the Investigator."

115. Moreover, the Hearing Board determined that "it is more likely than not that [Roe] reciprocated [Doe's] kiss and that she assisted in removing her pants."

116. Nevertheless, the Hearing Board determined that Doe "did not obtain affirmative consent to place his hands under [Roe's] shirt, to conduct foreplay on [Roe], or to engage in sexual intercourse with Roe."

117. The Hearing Board rejected the idea that Roe lacked capacity to consent, but found that Doe had not obtained "affirmative consent" to engage in sexual activity after Roe had helped Doe to remove her pants, despite finding that Roe had willingly laid in Doe's bed with him, kissed him, helped him take off her pants, asked him to get a condom, and asked him to "go slower" during intercourse.

118. In arriving at its erroneous determination, the Hearing Board inappropriately relied almost exclusively on what it perceived to be a lack of "verbal consent" by Roe.

## Doe Appealed the Unsupported Findings of the Hearing Board

119. On August 3, 2017, Doe submitted his appeal to Defendant's Appeal Board. Doe argued that the finding of the Hearing Board was "prejudicial, arbitrary, capricious, and not supported by substantial evidence," and that it relied almost exclusively on what it considered to be a lack of "verbal consent."

120. On August 14, 2017, the Defendant's Appeal Board denied Doe's Appeal.

121. The Appeal Board predicated its ruling on facts not in the record when it ruled that, "In terms of the reasonableness standard indicated by [Doe], the appeals board determines

that no reasonable person would assume that an individual acting withdrawn and laying prone, clothed or unclothed, would be providing clear permission for sexual activity or affirmative consent with their actions."

122. The Hearing Board had made no finding that Roe was "withdrawn and laying prone"

123. In fact, Roe was at all times, an active and willing participant in the sexual activities with Doe. There was no time when Roe was "withdrawn and laying prone" during the sexual activity.

124. Every witness testified that Roe was active that evening, cuddling, kissing, and laying on Doe.

125. Roe, herself, never testified that she was "withdrawn and laying prone." Roe did testify that she was "unresponsive," but when asked to explain Roe replied, in part "aside from somewhat kissing him back I did not physically do anything sexual to him and I did not in any way verbally respond that I wished for any of these things to be occurring. So I would consider that non-respondent."

126. When asked by the Hearing Board if she considered asking Doe to retrieve a condom as responsive, Roe replied, "I would consider that being responsive, but it was done under an umbrella of feeling fear or feeling uncomfortable to an extreme extent of responding any other way."

127. The Hearing Board, which made credibility determinations, did not find that Roe was impaired and thus unable to give affirmative consent. Instead, the Hearing Board simply found that that Doe did not obtain affirmative verbal consent before certain sex acts. Thus the Appeals Board made a determination that the Hearing Board did not make based on evidence not contained in the record.

128. The Appeals Board further ruled that the sanctions in the Hearing Finding Letter were to take effect immediately.

**Defendant's Arbitrary and Capricious Application of "Affirmative Consent"**

129. Defendant's "Student Code of Conduct" contains at least three different definitions of affirmative consent.

130. The "Glossery and Sanctions" section defines affirmative consent as

> Clear, unambiguous, knowing, informed, and voluntary agreement between all participants to engage in sexual activity. Consent is active, not passive. Silence or lack of resistance cannot be interpreted as consent. Seeking and having consent accepted in the responsibility of the person(s) initiating each specific sexual act regardless of whether the person initiating the act is under the influence of drugs and/or alcohol. Consent to any sexual act or prior consensual sexual activity between or with any party does not constitute consent to any other sexual act. The definition does not vary based on a participant's sex, sexual orientation, gender identity or gender expression. Consent may initially be given but withdrawn any time. When consent is withdrawn or cannot be given, sexual activity must stop. Consent cannot be given when a person is incapacitated. Incapacitation occurs when an individual lacks the ability to fully, knowingly choose to participate in sexual activity. Incapacitation includes impairment due to drugs or alcohol (whether such use is voluntary or involuntary), the lack of consciousness or being asleep, being involuntarily restrained, if any of the parties are under the age of 17, or if an individual otherwise cannot consent. Consent cannot be given when it is the result of any coercion, intimidation, force, or threat of harm.

131. The "Sexual Violence Prevention and Response" ("SVPR"), "Definitions" section contains 2 definitions of consent pursuant to New York State Crime Definitions. One states, in part, "at the time of the act of intercourse, oral sexual conduct, or anal sexual conduct, the victim clearly expressed that he or she did not consent to engage in such act, and a reasonable person in the actor's situation would have understood such person's words and acts as an expression of lack of consent to such act under all the

circumstances." The other definition states, "[c]lear, unambiguous, and voluntary

agreement between the participating [parties] to engage in specific sexual activity."

132. The SVPR section also provides the following definition for affirmative consent.

> Affirmative consent is a knowing, and voluntary, and mutual decision among all the participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression. Consent to any sexual act or prior consensual sexual activity between or with any party does not necessarily constitute consent to any other sexual act. Consent is required regardless of whether the person initiating the acts is under the influence of drugs and/or alcohol.

> Consent may initially be given but withdrawn at any time. Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in a sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be intoxicated, and therefore unable to consent. Consent cannot be given when it is the result of any coercion, intimidation, force, or threat of harm. When consent is withdrawn or can no longer be given, sexual activity must stop.

133. This last definition, which the Hearing Board relied upon in its Decision, was

promulgated by Defendant pursuant to Section 6441 of New York Education Law Article

129-B.

134. Article 129-B of the Education Law mandates that "[e]very institution shall adopt" the

definition of affirmative consent contained in Section 6441. Nevertheless, Defendant

maintained three different definitions of affirmative consent.

135. In addition, the State Education Department and the New York State Office of Campus

Safety issued joint guidance to assist universities in complying with Education Law 129-

B on or about June 2, 2016. That guidance expressly states, "the burden of showing that

a student had sexual activity or contact with another without affirmative consent as

defined [in Section 6441] is on the institution, not on the respondent to prove a negative."

136. The guidance document also expressly states that "there is no requirement under the

definition of consent that there be 'verbal' consent or a specific statement of yes."

137. Doe was erroneously found responsible for something he did not do based on an

erroneous interpretation and application of the definition of affirmative consent, in spite

of the dearth of evidence to support a finding of lack of affirmative consent.

138. Defendant failed to substantially comply with its own guidelines and  its determination

was not rationally based on the evidence.

139. New York law and regulations governing the state universities of New York require that

said universities promulgate regulations governing the conduct and behavior of students

and student disciplinary proceedings, and that the regulations must afford students due

process and fundamental fairness in accordance with the requirements of the regulations

when suspension or expulsion of the student is at issue.

140. Pursuant to the "Disciplinary Reports and Initial Conference" section of Defendant's

Student Code of Conduct,

> If a student has allegedly violated the Student Code of Conduct a "Disciplinary
> Specification of Charges" letter will be sent to the student's official Purchase
> email account arranging a meeting, which is called an initial conference. The
> initial conference offer will schedule an initial conference and notify the accused
> in writing of the time and place of the meeting, which will be conducted within
> seven (7) working days from the date of notification of the incident report. This
> information is included in the specification of charges letter.

141. Defendant failed to send Doe a Disciplinary Specification of Charges letter. In fact,

Defendant did not inform Doe what codes of conduct he was alleged to have violated

and/or the substantive factual allegations until May 9, 2017, at the Initial Conference at

which time Doe met with Defendant's Title IX Coordinator/ Title IX Investigator.

142. Doe met with Defendant's Title IX Investigator with no notice of the precise charges or

nature of the allegations against him.

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. Section 1681, *et seq* -
Erroneous Outcome and Selective Enforcement**

143.  John Doe repeats and re-alleges each and every allegation hereinabove as if fully

set forth herein.

144. Title IX of the Education Amendments of 1972 provides, in relevant part, that:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education program or activity

receiving Federal financial assistance."

145. Title IX of the Education Amendments of 1972 applies to all public and private

educational institutions that receive federal funding, which includes Defendant SUNY Purchase.

146.  Title IX may be violated by a school's failure to prevent or remedy sexual

harassment or sexual assault or by the imposition of university discipline where gender is a

motivating factor in the decision to discipline.

147. Both an "erroneous outcome" and an "unjust severe penalty" occurred in this

case. John Doe was innocent and wrongly found to have committed a violation of SUNY Purchase's

Code of Conduct.  In addition, in Defendant's mishandling of the investigation, the hearing, the

decision, and the treatment of Doe upon his return to SUNY Purchase in the fall of 2018,  gender bias

was a motivating factor and, indeed, the only explanation for the treatment of John Doe by

Defendant.  In addition, Defendant imposed an unwarranted and excessively severe sanction on John

Doe and gender bias was a motivating factor in the imposition of the sanction.

148. Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

149. The "prompt and equitable" procedures that a school must implement include, at a minimum:

• "Notice . . . of the procedure, including where complaints may be filed"; *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties --Title IX* (2001) at 19-20, 21 & nn.98-101.

• "Application of the procedure to complaints alleging [sexual] harassment...";

• "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

• "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

• "Notice to the parties of the outcome of the complaint......"

150. Based on the foregoing, Defendant failed to conduct an adequate, reliable, and impartial investigation of the Roe complaint.

151.  Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings; the decision to impose an unjustly severe penalty upon John Doe; and the failure to protect Doe from hostile environment harassment upon his return to SUNY Purchase in 2018.

These circumstances include, without limitation:

a)  The Title IX hearing board specifically found Roe's statements to be conflicting and unreliable as to her inability to give consent, the central issue at the hearing. The hearing board noted "gaps" in her memory and Roe's testimony concerning her alcohol and drug consumption was inconsistent with her original report to the investigator and expressed concern that she had changed her story after reading statements submitted by other witnesses and parties.

b)  Defendant accepted Jane Roe's allegations of lack of consent at face value, despite finding her not credible, and despite the multiple factual indicia supporting Doe's testimony that Roe was not only a willing actor in the sexual interaction and that her consent was given verbally and nonverbally and not withdrawn at any time, but that she was in fact the initiator of sexual activity.

c) Defendant accepted, without question, major changes to Roe's story.

d) Defendant accepted Roe's unsubstantiated and contradictory allegations as true despite finding that she lacked credibility.

e) The hearing board ignored the evidence that corroborated Doe's account, namely, that Roe was physically affectionate with Doe in his dorm in the presence of others; stayed in his suite after he left for hours awaiting his return; asked to be left alone with him upon his return; again, initiated physical contact with Doe; asked Doe if she could spend the night with him;

undressed in his room and put on his pajama bottoms; got into his bed and engaged in mutual kissing and foreplay; helped him to remove her pajama bottoms; asked him to retrieve a condom (an unequivocal verbal request **by her** that the sexual activity proceed to intercourse); and asked him to go slower during intercourse.

f) The hearing Board ignored that Roe gave no indication that she did not want to have sexual intercourse with the Doe (and every indication that she did want to), despite the fact that she could easily have done so without fear, as Doe's roommate was in his bed in the very same room with them the entire time.

g) Instead, the hearing board relied on an overly formalistic view that Doe was guilty of sexual assault because he had not received express verbal consent of the kind one might find in a legal document and not the kind of communication that human beings mutually engaging in consensual sexual conduct give to one another.

h) Defendant demonstrated a presumption of guilt against John Doe and in so doing, Defendant showed extraordinary gender bias, since they inexplicably continued to credit Roe even after finding her central allegations concerning consent lacked credibility. The only possible explanation for these skewed credibility assessments is gender bias.

152.    Further, upon information and belief, Defendant SUNY Purchase possesses communications evincing Defendant's predisposition to favor female students alleging sexual misconduct over male students who are accused of sexual misconduct.

153.    Upon information and belief, Defendant SUNY Purchase has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

154.    Based on the foregoing, Doe was subjected to a biased, prejudicial and unfair

process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it and said process resulted in the arbitrary and capricious and, in fact, erroneous finding of Defendant's Title IX Hearing board and its Appeals Board that Doe was responsible for sexual misconduct in the absence of substantial evidence, much less any evidence at all.

155.    In addition, Defendant imposed severe penalties against Doe for sexual conduct initiated by Roe.  On information and belief, had Doe been a woman found responsible for non-consensual sexual intercourse, Defendant would not have imposed the sanctions it imposed here.

156.    As a direct and proximate result of the above conduct, Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, past and future economic loss, and other direct and consequential damages.

157.    As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

AS AND FOR A SECOND CAUSE OF ACTION

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. Section 1681, *et seq* – Deliberate Indifference**

158.    Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

159.    Defendant acted with deliberate indifference in failing to protect Doe, because he was a man, from harassment upon  his return to SUNY Purchase for the fall semester of 2018.

160.    Defendant acted with deliberate indifference in failing to protect Doe from known acts of harassment in its programs and activities in that it refused to act to prevent foreseeable

30

mistreatment of Doe by students and, when it occurred, its response to being apprised of such harassment was clearly unreasonable in light of the known circumstances.

## AS AND FOR A THIRD CAUSE OF ACTION

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. Section 1681, *et seq* – Hostile Environment**

161.   Defendant's acts and omissions resulted in Doe enduring a hostile and abusive environment upon his return to SUNY Purchase for the fall semester of 2018.

162.   The environment was permeated with discriminatory intimidation, ridicule, and insult so severe and pervasive that it altered the conditions of Doe's educational environment.

## AS AND FOR A FOURTH CAUSE OF ACTION

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. Section 1681, *et seq* – Retaliation**

163.   Upon his return to SUNY Purchase in the Fall Semester of 2018, Doe was subjected to adverse school-related action with a retaliatory motive.

## AS AND FOR A FIFTH CAUSE OF ACTION
**Violation of the New York State Constitution (Art. I, § 6, Due Process)**

164. Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

165. Pursuant to the New York State Constitution, Doe cannot be deprived of life, liberty or property without due process of law.

166. Defendant, a state actor, through its agent and employees, is subject to Education Law Art. 129.

167. As a direct result of Defendant's actions, which they undertook under the color of state law, Doe has suffered a loss of his protected liberty interest in his good name, reputation, honor, and integrity, coupled with the irretrievable loss of his good standing as a student at SUNY Purchase.

168. By mandate of New York State law, until on or about April 21, 2021, Doe's transcript reflected that he was suspended for a sexual misconduct code violation.

169. As set forth in detail above, Defendant SUNY Purchase deprived Doe of his liberty interests, and caused him resulting reputational and tangible harm, without due process of law.

170. Defendants failed to timely notify Doe of the charges against him, failed to provide Doe a fair hearing, and erroneously adjudicated him responsible for a code of conduct violation which is, in fact, a serious crime, without substantial evidence or any evidence, in a finding that was arbitrary and capricious and gender-biased. Moreover, Defendant imposed severe sanctions on Doe and failed to protect him against harassment upon his return to SUNY Purchase.

171. As a direct and proximate result of Defendant's conduct, Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

172. As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

AS AND FOR A SIXTH CAUSE OF ACTION
**Breach of Contract**

173. Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

174. At all times relevant hereto, a contractual relationship existed between SUNY Purchase and Doe through SUNY Purchase's policies and procedures governing the student disciplinary system, including but not limited to the Code of Conduct.

175. Through the documents it publishes and provides to students, Defendant SUNY Purchase makes express contractual commitments to students involved in a disciplinary process.

176. Based on the foregoing, SUNY Purchase created express and implied contracts with Doe.

177. The contracts contained an implied covenant of good faith and fair dealing. They implicitly guaranteed that any proceedings would be conducted with basic fairness.

178. Based on the aforementioned facts and circumstances, Defendant SUNY Purchase breached its agreement(s) with John Doe and the implied covenant of good faith and fair dealing therein.

179. Defendant SUNY Purchase committed several breaches of its agreements with Doe during the investigation, hearing process, and upon his return to SUNY Purchase in 2018 including, without limitation:

a) discriminating against Doe on the basis of his gender, as set forth above, in violation of the Student Code of Conduct, which breach caused the aforementioned harm to Doe;

b) failing to adhere to even a "preponderance of evidence" standard, in adjudicating Doe responsible for a sexual assault, in the absence of substantial evidence (In the Matter of John Doe v Purchase College State University of New York ), which breach caused the aforementioned harm to Doe.

180. Based on the aforementioned facts and circumstances, Defendant SUNY Purchase breached and violated the covenant of good faith and fair dealing implied in the agreement(s) with Doe.

181. As a direct and foreseeable consequence of the foregoing breaches, Doe sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

182. As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial.

AS AND FOR A SEVENTH CAUSE OF ACTION
**Breach of Contract/Common Law:**
**Denial of Basic Fairness/Arbitrary and Capricious Decision Making**

183. Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

184. Defendants had a duty, either under an express or implied contract or as a matter of common law, to ensure that the proceedings against Doe were conducted in good faith and with basic fairness.

185. Defendants breached this duty of good faith and basic fairness by, without limitation:

   • Finding the defendant responsible for sexual assault in the absence of substantial evidence which is evidence that a reasonable mind would accept as adequate to support a conclusion.

   • Failing to provide timely and specific notice to Doe of the allegations against him, thereby depriving him of an opportunity to test those allegations and counter them during the proceedings, particularly as the allegations changed over time;

34

• Failing to provide Doe notice of his right to present evidence and witnesses on his behalf during the investigation;

• Failing to provide Doe notice of his right to make an impact statement at the sanctions phase of the investigation;

• Failing to provide Doe notice when the Title IX investigation had reached a point where sanctions were being deliberated;

• Employing a method of investigation and adjudication intended to bolster the accounts of female accusers and rationalize their inconsistencies, to the detriment of the male accused;

• Failing to provide Doe the opportunity to be heard in front of a fair and impartial tribunal;

• Failing to provide Doe the opportunity to confront and cross-examine witnesses at a fair hearing.

• Failing to take any steps to ameliorate the hostile environment Doe was forced to endure upon his return to SUNY Purchase following his suspension, which were a foreseeable consequence of the wrongful adjudication, sanctions, and dissemination of the false and defamatory information, rumor and surmise.

186. Defendants' breach of the duty to ensure basic fairness proximately caused Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

187. As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
**Promissory Estoppel and Reliance**

188. Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

189. Defendant SUNY Purchase's policies constitute unambiguous representations and promises that SUNY Purchase should have reasonably expected to induce action or forbearance on the part of John Doe.

190. Defendant SUNY Purchase expected or should have expected Doe to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including, but not limited to: the opportunity to attain his educational objectives at SUNY Purchase; to have his health, safety, welfare and human rights protected; to have any claims brought against him under the Student Code of Conduct be heard by an impartial and objective panel, to be free from discrimination, and to have complaints resolved impartially and promptly and based on substantial evidence and in the absence of the arbitrary and capricious administration of the rules and procedures required.

191. Doe reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by Defendant SUNY Purchase, by choosing to attend SUNY Purchase rather than other schools of equal caliber, and even choosing to return to SUNY Purchase after his wrongful suspension, with the reasonable expectation that Defendant would ensure that he could return to his studies free from hostile environment harassment.

192. These express and implied promises and representations made by SUNY Purchase must be enforced to prevent substantial injustice to Doe.

193. Based on the foregoing, Defendant SUNY Purchase is liable to Doe based on promissory estoppel.

194. As a direct and proximate result of the above conduct, Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

195. As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Doe demands Judgment against the Defendants as follows:

(i) on the First Cause of Action for violation of Title IX of the Education Amendments of 1972, a declaratory judgment per 28 U.S.C. § 2201 that Defendants violated Title IX by erroneously finding John Doe responsible for sexual misconduct in the absence of substantial evidence, arbitrarily and capriciously, in violation of Defendant's policies and unjustly sanctioning him with a one-year suspension and, further, a year of persona non grata status at SUNY Purchase that deprived him of educational opportunities; a judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;
;

(ii) on a Second Cause of Action for violation of Title IX of the Education Amendments of 1972, for deliberate indifference in failing to protect Doe from acts of harassment in its programs and activities, a judgment awarding Doe damages in an amount to be determined at

trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii) on a Third Cause of Action for violation of Title IX of the Education Amendments of 1972 for hostile environment, a judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv) on a Fourth Cause of Action for violation of Title IX of the Education Amendments of 1972 for retaliation, a judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v) on a Fifth Cause of Action for a violation of the New York State Constitution, a declaratory judgment per 28 U.S.C. § 2201 that Defendants violated Art. I, § 8 of the New York State Constitution by denial of procedural due process, a monetary judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi) on a Sixth Cause of Action for breach of contract, a declaratory judgment per 28 U.S.C. § 2201 that Defendants breached a contract with Doe, a monetary judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(vii) on a Seventh Cause of Action for denial of basic fairness under contract and common law, a judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii) on an Eighth Cause of Action for promissory estoppel, a declaratory judgment per 28 U.S.C. § 2201 that Defendants are subject to promissory estoppel, a monetary judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, past and future economic losses, loss of educational opportunities, and loss of future career prospects; and

(ix) awarding Doe such other and further relief as the Court deems just, equitable and proper.

**JURY DEMAND**

Plaintiff Doe herein demands a trial by jury of all triable issues in the present matter.

Dated: New York, New York
October 6, 2021

**AIDALA, BERTUNA & KAMINS, P.C.**

By: _____/s/_____
    Imran H. Ansari, Esq.
    *Attorneys for Plaintiff*
    546 5th Avenue, Sixth Floor
    New York, New York, 10036
    (212) 486-0011
    iansari@aidalalaw.com